901 P.2d 1300

**HOUSING FINANCE AND DEVELOP-MENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,**

v.

**HAROLD K.L. CASTLE FOUNDATION, a Hawai'i non-profit corporation, Defendant–Appellant,**

**and**

**Earl Leroy Walker, Gary Lynn Wiseman, Jane Saeko Ikeda, Kiyoshi Ikeda, Gwenette Ann Higa, Roland W. Eaker, Defendants–Appellants,**

**and**

**Caren Shizuko Demeo; Howard Joseph Demeo; Marion G. Eaker; Barbara L. Jennings; Kirk E. Jennings; Bernadette Kahahawai; Joseph Kahahawai; Patricia Ann Kop; Sharyn Lee Munchmeyer; Myra Naomi Munekata; Deborah**

322

Chieko Nogami Oyama; Cleighton Pang; Sharon S. Pang; Catherine Hills Rice; Richard Knapp Rice (James Paul Lynn Flynn, Jr. and Barbara Jo Flynn Sanchez, Sellers under Agreement of Sale); Heather Shepard Shannon; McKenzie Herrick Shannon; Rita Jane Renfor Smith; Chad Ken Taniguchi; Dolly Sasaki Towne; Gordon Sheldrake Towne; John A. Roney; Nancy C. Roney, Defendants–Appellees,

and

Jane Ann Wade Benouis; Mustapha Kemal Benouis; Cheryl Brooke Bukarau; Waqanivalu Isoa Bukarau; Richard Francis Buonviri; Susan Harrison Buonviri; Barbara Z. Culler; Timothy A. Culler (William E. Lee and Ruth B. Lee, Sellers under Agreement of Sale); Lawrence Bernard Kane, Jr.; Puanani Janette Kane; Deborah Marr; Dorothy Mitsuko Oda; John Eichi Oda; Lydia Robinson; Thurston E. Robinson; Carol Lynn Shulik; David Ronald Shulik; Dorothy Eugenia Sigler; Diane Akie Smith; Elbridge Wright Smith; Edward Richard Underwood; Edmund H. Volkart; May Ellen D. Volkart; John Ronald Orsini; Karen Jo Patrick Orsini; John Does 1–50; Mary Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; Doe "Non–Profit" Corporations 1–50; and Doe Entities 1–50, Defendants (Civ. No. 90–3750),

and

HOUSING FINANCE AND DEVELOPMENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

HAROLD K.L. CASTLE FOUNDATION, a Hawai'i non-profit corporation, Defendant–Appellant,

and

Charles Matthews White, George S. Yamamoto, Eloise F. Wickersham and Hawaiian Trust Company, Limited, a Hawai'i corporation, Successor Trustees of the trust created by the unrecorded Declaration of Revocable Living Trust dated September 11, 1979, made by Horace Winfred Beek White, as Settlor and Trustee, as amended; Bishop Trust Company, Limited, a Hawai'i corporation, Ancillary Special Administrator of the Estate of Lewis Winn Stunston, Jr., having been so appointed by the Circuit Court of the First Circuit, State of Hawai'i, in a proceeding designated as Probate No. 41923; Leo G. Ziffren, Lester Ziffren and Robert L. Caldwell, Successor Trustees of the trust created by Declaration of Trust dated September 9, 1988, as amended, executed by Paul Trousdale, also known as Paul Whitney Trousdale and Paul W. Trousdale, as Trustor and Trustee, a memorandum of which has been recorded in the Office of the Assistant Registrar of the State of Hawai'i as Document No. 1752870 and in the Bureau of Conveyances of the State of Hawai'i as Document No. 90–144115; W. Lawrence Clapp, Ancillary Special Administrator of the Estate of Marguerite T. Peck, also known as Marguerite Reid Peck, Marguerite Trousdale, Marguerite Reid Trousdale, Marguerite Trousdale Peck and Marguerite Peck, having been so appointed by the Circuit Court of the First Circuit, State of Hawai'i, in a proceeding designated as Probate No. 42920; W. Lawrence Clapp, Successor Trustee of the trust created by the Trust Agreement dated June 30, 1965, made by and between Paul Whitney Trousdale as Settlor, and Horace Winfred Beek White, as Trustee, which has been filed in said office as Document No. 378726 and recorded in said Bureau in Liber 5135, at page 538, as supplemented; W. Lawrence Clapp, Ancillary Personal Representative of John Dabney Murchison, deceased, having been so appointed by the Circuit Court of the First Circuit, State of Hawai'i, in a proceeding designated as Probate No. 40353; Willis Lawrence Clapp, as Authorized Agent and Attorney-in-fact on behalf of the Estate of Clinton Williams Murchison, Jr., deceased, pursuant to and under the supervision of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in Case No. 385–30266–A–11; Heirs and/or

Devisees of Thomas H. Lively, Jr. and Robert F. Thompson, deceased, by virtue of an unrecorded written agreement as disclosed by that certain Affidavit dated August 31, 1988; Embassy Hawaii Corporation, a Hawai'i corporation (formerly known as Blackfield Hawaii Corporation, a Hawai'i corporation); Robert Steven Ale; Frances K. Asing; John M. Asing; Jamie Louise Ault; John William Ault; Holly K. Bachini; Robert C. Bachini; Gail Choon Sil Brown; William Wesley Harrison Brown; Carole Ann Brutlag; Gail Diane Caveney; Robert Lawrence Caveney; Dennis Deano Crabtree; Lisa Ann Crabtree; Miriam S. Curry; Raphael J. Curry; Joseph Lovejoy Dwight III; Robin Wittbrodt Dwight; Byron J. Ferreira; Carolyn G. Ferreira; Geraldine Reiko Fukumoto; Dolores Jane Graham; Paül Frederick Graham; James Douglas Hamblett; Gwenette Ann Higa; Harumi Hirata; Malfalda Hirata; Donald A. Hudson; Kathleen Defoster Hudson; Lydia K. Lake; Thomas C. Lake, Jr.; Julie Rae Lindemann; Richard John Lindemann; Daniel Allen McDougal; Jo Shalimar McGirr; Murton Kent McGirr; Craig Stephen McGlinn; Kathleen Tracy McGlinn; Donald Owen McInnis; Peggy Lorraine McInnis; Ann Stamp Miller; Peter Franklin Miller (Debra T. Ozawa, Seller under Agreement of Sale); Donald Ray Moore; Cary R. Nederhouser; Denise Nederhouser; Cynthia Rae Newsome; Keith Allison Newsome; Nooria Noor; Elizabeth Kelsey Owens; Elmer Lee Owens; Marcella Elvera Porzelt; Russell Daniel Porzelt; Alfredo Roque; Arnel M. Roque; Rosario Roque; Gary Paul Shuman; Geraldine Patricia Shuman; Carolyn J. Steinberg; Christopher John Stevens; Holly Carlyn Stevens; Harry Eugene Wellman; Mary Mari Yasuda; Roy Masao Yasuda, Defendants–Appellees,

and

Bonnie Sue Busch; Helga Gertrud Emmerson; John George Emmerson; Betty J. Howard; George F. Howard; Elizabeth Theresa Kollen; Gregory Michael Kollen; Craig Stephen McGlinn; Kathleen Tracy McGlinn; Hazel M. Meyer;

Carol A. Pagaduan; Orlando R. Pagaduan; Lucille M. Peck; Percy D. Peck; Hillary Ann Radovich; Scott Douglas Radovich; Sylvester Sneidar; Tiare Jacque Sneidar; John Wesley Stephens; Judy Koshie Tanabe; Deborah Kay Ziemke; John Does 1–200; Mary Does 1–200; Doe Partnerships 1–50; Doe "Non–Profit" Corporations 1–50; Doe Corporations 1–50; and Doe Entities 1–50, Defendants (Civ. No. 91–0355).

No. 16292.

Intermediate Court of Appeals of Hawaii.

Aug. 30, 1995.

324

Gary M. Slovin, Bruce L. Lamon and Carol A. Eblen (Goodsill Anderson Quinn & Stifel, of counsel), on the brief, Honolulu, for defendant-appellant Harold K.L. Castle Foundation.

Thomas T. Watts, on the briefs, Honolulu, for defendants-appellants Jane Saeko Ikeda, Kiyoshi Ikeda and Roland W. Eaker.

Sonia Faust, Stanley H.C. Young and Carolee M. Aoki, Deputy Attys. Gen., on the brief, Honolulu, for plaintiff-appellee Housing Finance and Development Corp.

Before ACOBA, J., CRANDALL, Circuit Judge in Place of Burns, C.J., Recused, and WILFRED K. WATANABE, Circuit Judge in Place of CORRINE K.A. WATANABE, J., disqualified.

ACOBA, Judge.

Plaintiff–Appellee Housing Finance and Development Corporation (Plaintiff), on April 1, 1991, brought a condemnation action against Defendant–Appellant[1] Harold K.L. Castle Foundation (Defendant) pursuant to the Hawai'i Land Reform Act (Act), Hawai'i Revised Statutes (HRS) chapter 516 (1985 & Supp.1992), on behalf of certain Defendant–Appellant lessees (Lessees). Under the Act, the State of Hawai'i is empowered to condemn the leased fee interests of the fee

---

1. Defendant's appeals were decided in Hawai'i Supreme Court Appeal No. 16293 on May 19, 1995. Defendant is actually an appellee here.

owners in leased property for the benefit of the lessees. HRS § 516–23 (1985). Plaintiff, an agency of the State, sought to acquire the leased fee interests of seventy-five lots owned by Defendant in Kailua, Hawai'i.

At trial, both Defendant and Lessees called appraisers as expert witnesses to testify to the fair market value of the leased fee interests sought to be condemned. Plaintiff's instruction No. 4 given to the jury, as modified, by agreement of the parties stated:

> The [Defendant] is entitled to just compensation. Just compensation is the fair market value of the leased fee interest of the lot which would apply if that leased fee interest were normally traded on an *open market.*
>
> The "fair market value" is defined as "that amount of money that a purchaser willing, but not obliged, to buy an interest in land would pay an owner willing, but not obliged, to sell it, taking into consideration all uses to which the land is adapted or might in reason be applied."

(Emphasis added.)

On appeal, Lessees'[2] sole contention is that the trial court erred in refusing to give Lessees' proposed instruction No. 14 which defined the term "open market." They appeal the judgment filed on June 12, 1992. We affirm.

The Act was enacted by the legislature in 1967. *See* 1967 Haw.Sess.L.Act 307, § 46 at 503. "The primary purpose of [the Act] is to provide [the] means by which the lessees of residential lease-hold lots may become vested with the fee simple title to their lots." Sen. Conf.Comm.Rep. No. 19 (Majority), in 1967 Senate Journal, at 799–801. The constitutionality of the Act was sustained by the United States Supreme Court in *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). In *Ha-*

*waii Hous. Auth.,* the Court held that the Act did not violate the "public use" requirement of the fifth amendment of the United States Constitution because "[t]he 'public use' requirement is ... coterminous with the scope of a sovereign's police powers," *id.* at 240, 104 S.Ct. at 2329, and "[r]egulating [an] oligopoly and the evils associated with it is a classic example of a State's police powers." *Id.* at 242, 104 S.Ct. at 2330. The constitutionality of the Act was recently reaffirmed by the Hawai'i Supreme Court in *Housing Fin. & Dev. Corp. v. Castle,* 79 Hawai'i 64, 898 P.2d 576 (1995).

The term "open market" in Plaintiff's instruction no. 4 is in the statutory definition of "owner's basis." HRS § 516–24 (1985) directs that "[t]he [just] compensation to be paid [the owner] for the leased fee interest in a residential houselot within a tract shall be the owner's basis as defined in section 516–1(14)."[3] In turn, HRS § 516–1 (Supp.1992) defines "owner's basis" as follows:

> "Owner's basis" means *the value of the lessor's leased fee interest in the lot that would apply if such interests were normally traded on an open market.* The fair market value of the owner's basis shall be established to provide the lessor with just compensation for the lessor's interests in the lot and shall take into consideration every interest and equity of the lessee in establishing that market value. The value may be determined by either of the following methods, *or any other method which is normally used by qualified appraisers in establishing the fair market value of a lessor's leased fee interest in land* [.]

(Emphases added.) The underscored language in the foregoing definition of "owner's basis" was added by the legislature, effective May 22, 1980, 1980 Haw.Sess.L.Act 107, § 2 at 81, "to correct the [c]onstitutional deficiencies in Chapter 516, Hawaii [Hawai'i] Revised Statutes, as outlined by Judge Samuel P.

---

**2.** Only Lessees Jane Saeko Ikeda, Kiyoshi Ikeda, and Roland W. Eaker have brought this appeal.

**3.** When the definition of "owner's basis" under Hawai'i Revised Statutes (HRS) § 516–1(14)

(1985) was amended, the numbering was removed. Thus, when referring to the current definition, the citation will read, HRS § 516–1 (Supp.1992).

King, of the U.S. District Court, in his decision in *Midkiff v. Tom and Wai–Kahala Tract "H" Assoc. (May 9, 1979)."* Sen. Stand.Comm.Rep. No. 611, in 1980 Senate Journal, at 1282. In *Midkiff v. Tom*, 471 F.Supp. 871 (D.Haw.1979), the United States District Court for the District of Hawaiʻi had held that the definition of "owner's basis" contained in HRS § 516–1(14)[4] (1976) "[could] pass constitutional scrutiny under the fourteenth amendment only if everything after the first two sentences in this definition of 'owner's basis' [was] ignored." *Id.* at 882–83. In addition, the court noted that in actual practice, expert witnesses "did not consider themselves to be so restricted by the statutory language." *Id.* at 883 n. 29. In response, the legislature amended the statute to allow "fair market value" to be established by "any other method which is normally used by qualified appraisers" in addition to the two methods already described in the statute. HRS § 516–1 (Supp.1992). Relevant to the instant case, the legislature also amended the first sentence of the "owner's basis" definition to include the term "open market," even though the district court expressly stated that "[t]he first two sentences of Haw.Rev. Stat. [§] 516–1(14) [1976] [were] not objectionable[.]" *Tom*, 471 F.Supp. at 882. We conclude, and the parties confirm, that no express legislative intent can be found for inclusion of the "open market" reference in HRS § 516–24 (1985). The term "open market" itself is not defined in the statute.

Our search reveals that the term "open market" is not ordinarily defined in appraisal manuals and guides, although it is commonly referred to in the definition of "market value." [5] "Market value" is defined as "[t]he

---

4. The previous version of HRS § 516–1(14) (1976) read as follows:

"Owner's basis" means the current fair market value of the lot. The fair market value shall be established to provide the lessor with just compensation for his interests in the lot and shall take into consideration every interest and equity of the lessee in establishing that market value. The value shall be determined by whichever following method provides just compensation and gives the greater consideration to the lessee's interest:
(A) The sum of: (i) the future rental stream for the lot for the term of the lease discounted to present worth from the expiration date of the lease; and (ii) the value of the lessor's reversionary interest in the lot discounted to present worth from the expiration date of the lease. The discount rate shall be based on the maximum rate of return for insured passbook demand saving account paid by the savings and loan institutions in Hawaii [Hawaiʻi] plus three and three-fourths per cent; provided, however, that the discount rate may be modified by mutual agreement of the lessor, lessee, and the authority; or
(B) The current fair market value of the lot, valued as if it were a fee simple lot and as if the fee title were unencumbered, and excluding onsite improvements, established by a market data approach utilizing comparable sales, less the following:
(i) The value of the lease, including any rights therein, if any, which accrues to the lessee;
(ii) That percentage of the general enhancement of the neighborhood which has been paid for or contributed directly or indirectly by the lessee;

(iii) The current replacement cost of that portion of existing offsite improvements, including overhead and profit at prevailing rates, which were paid for or otherwise contributed directly or indirectly by the lessee;
(iv) That percentage of the general enhancement of the development tract and the lot caused by the onsite improvements on the lot paid for, or contributed, directly or indirectly, by the lessee;
(v) That amount, not otherwise deducted herein, allocated to the lot, which was paid for or otherwise contributed, directly or indirectly by the original lessee, computed at prevailing rates for overhead and profit in developing the development tract established by existing practice in the community; and
(vi) That amount for fees and costs which would ordinarily be borne by lessor in transferring such interest to lessee, including, but not limited to, attorneys' or realtors' commissions, other costs of sale, and similar fees;
provided, however, that the values established by any one of the foregoing shall not be duplicated in any one of the other provisions.

5. The definitions of "market value" and "fair market value" contain similar elements and are often used interchangeably. *See United States v. Thurston*, 4 U.S.Dist.Ct. and Haw. 16, 20–21 (1912) (an eminent domain case in which the court used fair market value and market value interchangeably). One court has stated that the terms *"market value"* and *"fair market value"* are synonymous. *Fort Worth & D.N. Ry. v. Sugg*, 68 S.W.2d 570, 572 (Tex.Civ.App.1934).

highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it is adapted and for which it was capable of being used." *The Appraisal of Real Estate* 21 (S. Shea–Joyce 10th ed. 1992) (citing· *Sacramento R.R. v. Heilbron,* 156 Cal. 408, 104 P. 979 (1909)); *The Dictionary of Real Estate Appraisal* 193 (2d ed. 1989). Similarly, "market value" is "[t]he highest price estimated in terms of money which a property will bring if exposed for sale in the open market, allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which it is adapted and for which it is capable of being used." *Condemnation Appraisal Practice* 4 (1961). "Market value" is also defined as "[t]he most probable price in terms of money which a property should bring in [a] competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus." B. Boyce, *Real Estate Appraisal Terminology* 160 (1981); *Encyclopedia of Real Estate Appraising* 25 (E. Friedman ed. 1978). Finally, "market price" is "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus." L. Hill & P. Hill, *The Residential Real Estate Appraiser's Portable Handbook* 8 (1990).

The term, "open market," has been employed in definitions of "market value" and "fair market value" in this jurisdiction. The Hawai'i Supreme Court has held that a statutory scheme of real estate taxation adopted "fair market value" as the relevant measure of property value. *In re Amfac, Inc.,* 65 Haw. 499, 654 P.2d 363 (1982). The court noted that precedent defined "market value" as the "'value in money of any property for which that property would sell on the open market by a willing seller to a willing buy-er.'" *Id.,* 65 Haw. at 502, 654 P.2d at 365–66 (quoting *In re Puna Sugar Co.,* 56 Haw. 621, 624, 547 P.2d 2, 4 (1976)). The court followed the same principle in *City & County of Honolulu v. Steiner,* 73 Haw. 449, 454, 834 P.2d 1302, 1306 (1992). In an eminent domain case, the United States District Court ruled that:

compensation must be estimated as the fair market value of the property at the time of the taking[.] This market value is not to be ascertained by what the property would bring at a forced sale, but by what it would fairly bring for any purpose if the owners themselves, without pressure, should offer it for sale.

.     .     .     .     .

The market value of a lease to the lessee is, of course, what it will sell for in the open market.

*United States v. Thurston,* 4 U.S.Dist.Ct. Haw. 16, 20–21 (1912).

Of course, "'[r]esort to legal or other well accepted dictionaries is one way to determine the ordinary meanings of certain terms [not statutorily defined].'" *State v. Chen,* 77 Hawai'i 329, 337, 884 P.2d 392, 400 (App.), *cert. denied,* 77 Hawai'i 489, 889 P.2d 66 (1994) (quoting *Rivas·v. State,* 787 S.W.2d 113, 115 (Tex.Ct.App.1990)). While Black's Law Dictionary does not define "open market," as in the appraisal literature, the term "open market" is found in the legal definition of "market value" and "fair market value." Black's Law Dictionary defines "market value" as "[t]he price property would command in the *open market.* [This means] the highest price a willing buyer would pay and a willing seller accept, both being fully informed, and the property being exposed for a reasonable period of time." *Black's Law Dictionary* 971 (6th ed. 1990) (emphasis added). Similarly, "fair market value" is defined as:

the price in cash, or its equivalent, that the property would have brought at the time of taking, considering its highest and most profitable use, if then offered for sale in the open market, in competition with other similar properties at or near the location of

the property taken, with a reasonable time allowed to find a purchaser.

*Id.* at 597 (citing *State v. Cooper Alloy Corp.*, 136 N.J.Super. 560, 347 A.2d 365, 368 (1975)).

Webster's Third New International Dictionary defines "open market" as a "freely competitive market in which any buyer or seller may trade and in which prices are determined by competition." *Webster's Third New International Dictionary* 1580 (1981). The Random House Unabridged Dictionary defines "open market" as "an unrestricted competitive market in which any buyer and seller is free to participate." *Random House Unabridged Dictionary* 1357 (2d ed. 1993). It is evident that these succinct definitions are consistent with the meaning ascribed to the term "open market" in the "market value" and "fair market value" definitions in the appraisal and legal authorities we have reviewed, *supra.* We hold, therefore, that an "open market," as referred to in the definition of "owner's basis" in HRS § 516–1, means "an unrestricted competitive market in which any buyer and seller is free to participate." In contrast, the proposed definition in Lessees' Instruction No. 14 read:

> "An open market is one in which anyone, or at least a large number of persons, can buy or sell."

Although Lessees argue that their proposed instruction No. 14 is an accurate statement of the law, they admit their definition of "open market" lacks any reference to a market which is competitive. While they contend the element of "competition" is implicit in their definition, Lessees' instruction No. 14 does not convey the requirement that the buyer and seller be unrestricted. Moreover, Lessees' proposed instruction No. 14 is ambiguous. The phrase, "can buy or sell," may connote a present ability to purchase or sell in contrast to the freedom to participate.[6]

6. Lessee's proposed instruction No. 14, if given, might have caused confusion when read in conjunction with Plaintiff's instruction No. 7 (given by the court as modified over Defendant's objection):

Accordingly, the trial judge properly rejected this instruction. "A trial court is not obligated to give any requested instruction which does not state the law with substantial correctness." *Stratis v. Pacific Ins. Co.*, 7 Haw. App. 1, 10, 739 P.2d 251, 257 (1987) (quoting 75 Am.Jur.2d Trial § 590 at 571 (1974)). Hence, we hold that it was not error for the trial court to refuse Lessees' proposed instruction No. 14.

However, the question remains as to whether an instruction defining "open market" should have been given, inasmuch as "[t]he boundaries of the trial judge's discretion in [refusing to give a jury instruction] are defined by the obligation to give sufficient instructions[.]" *Tittle v. Hurlbutt*, 53 Haw. 526, 530, 497 P.2d 1354, 1357 (1972). Defendant argues that the definition of "open market" is a matter to be left to expert witnesses. We do not entirely agree with Defendant. In requiring the leased fee interests to be valued as "if such interests were normally traded on an open market," the legislature presumed a hypothetical market, but nonetheless, one which was "open," and thus, unrestricted and competitive. The experts must make their judgments concerning "fair market value" with reference to this hypothetical market and are not at liberty to disregard this imposed assumption. In doing so, however, they may employ "any" method "normally used by qualified appraisers in establishing the fair market value of a lessor's leased fee interest[.]" HRS § 516–1.

We hold, furthermore, that the concept of an "open market" was adequately covered by the instructions.

In this case, the jury was instructed that "just compensation" meant the "fair market value" of the lessor's leased fee interests as if "normally traded" on an open market. The jury was instructed, as we have indicated, that "fair market value" was defined as follows:

> You are not to consider whether any lessee can or cannot afford to purchase the leased fee interest in his or her lot.

"Fair market value" is defined as "that amount of money that a purchaser *willing, but not obliged,* to buy an interest in land would pay an owner *willing, but not obliged,* to sell it, taking into consideration all uses to which the land is adapted or might in reason be applied."

(Emphasis added.) The setting in which a purchaser and seller are "willing, but not obliged" to buy and sell, respectively, indicates that the market participants were unrestricted in their economic decisions, since they were "not obliged" to buy or sell and competitive, since their "willing" purchase and sale denote the ability to deal freely with each other. Consequently, the "fair market value" definition, (which posits a hypothetical purchaser willing but not obliged to buy and a hypothetical seller willing but not obliged to sell), coupled with the "just compensation" definition, (which directs that leased fee interests be valued as if "normally traded,") essentially incorporate the unrestricted, competitive and participatory concept of an open market. We note, also, that the jury made no inquiry of the court concerning the definition of "fair market value" or "open market." "The trial judge [here] [did] not exceed the limits of his discretion by [refusing] [the] requested instruction [because it was] substantially covered by other instructions[.]" *Tittle,* 53 Haw. at 531, 497 P.2d at 1357.

Generally, " '[r]epetitious instructions should be avoided[.]' " *DiCenzo v. Izawa,* 68 Haw. 528, 543, 723 P.2d 171, 180 (1986) (quoting *Tittle,* 53 Haw. at 531, 497 P.2d at 1357) (brackets omitted). While we believe the concept of an "open market" was adequately covered by the instructions, our holding does not prohibit a trial court from instructing the jury on the definition of "open market," if it believes the instruction is necessary and will not be confusing to the jury.

Because Lessees' proposed instruction No. 14 was not an accurate statement of the law and, alternatively, because the concept of an "open market" was adequately covered by the instructions given, we find that the trial court did not err in refusing to give Lessees' said instruction. Accordingly, the June 12, 1992 Judgment is affirmed.